UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>JONATHAN CHANG,<br><br>                    Defendant. | Case No.  5:16-cr-00047-EJD-1<br><br>**ORDER GRANTING NEW TRIAL;**<br>**DENYING ALTERNATIVE RELIEF**<br><br>Re: ECF Nos. 388, 483 |

After a jury convicted Defendant Jonathan Chang of wire fraud and money laundering, and while Chang's case was mid-appeal, the government disclosed for the first time that the lead investigator in his case had committed misconduct.  In response, the Ninth Circuit remanded Chang's case for further proceedings.  Back before this Court, Chang pursued discovery related to the government's late disclosure, which revealed further evidence impeaching the lead investigator's honesty.  Chang now moves in the alternative for dismissal of his indictment with prejudice, new trial, or other sanctions.  Because the Court finds that the government showed serious—bordering on deliberate—disregard for its *Brady* obligations, the Court invokes its supervisory authority to **VACATE** Chang's conviction and sentence and to **GRANT** him a new trial.

I.      **BACKGROUND**

In 2016, a grand jury indicted Chang and his wife on seven counts of wire fraud and money laundering as well as two related counts of conspiracy.  Indictment, ECF No. 1.  The indictment centered around Home of Christ 4, the church that Chang attended.  According to the indictment, Chang created two entities named after his church, Home of Christ Associates LLC and Home of Christ Associates, Inc. (collectively, HOC Associates).  *Id.* ¶¶ 1, 4, 6.  Although

Chang fully controlled HOC Associates, that is not what he told others.  Instead, Chang allegedly made false representations to a foreign philanthropist that HOC Associates was affiliated with his church.  In this way, Chang convinced the philanthropist to redirect donations meant for his church, sending them to HOC Associates instead.  *Id.* ¶¶ 7–15.  Chang also allegedly defrauded his fellow church members by representing to them that HOC Associates was controlled by the foreign philanthropist who had been donating to their church.  Using this misrepresentation, Chang convinced his church to sell its property to HOC Associates.  *Id.* ¶¶ 17–20.

Chang and his wife stood trial on those charges in August 2019.  After ten days of trial and three days of deliberation, a jury convicted Chang on all seven counts of wire fraud and money laundering.  However, the jury deadlocked on the two counts of conspiracy and all counts against Chang's wife.  Jury Verdict, ECF No. 200.  The government elected to dismiss each of the deadlocked counts and proceeded to Chang's sentencing.  Order of Dismissal, ECF No. 221.  Afterwards, Chang appealed his conviction to the Ninth Circuit.  Notice of Appeal, ECF No. 279.

On March 22, 2021, a year and a half after the jury's verdict, the government revealed for the first time that the agent in charge of investigating Chang's case, Special Agent Mark Matulich, had misled the FBI about personal misconduct that occurred while he was on foreign detail.  Ex. 1B at 2–3.[1]  Specifically, the government informed Chang that Matulich had paid for sex while abroad and then failed to disclose that contact in violation of FBI policy.  *Id.*  This prompted the Ninth Circuit to stay Chang's appeal and remand to this Court for further proceedings related to the government's revelation.  Appeal Order, ECF No. 315.

On remand, the government voluntarily produced some documents about Matulich's misconduct, but it balked when Chang requested more.  *See* Stipulation, ECF No. 334.  Consequently, the parties engaged in a campaign of discovery litigation for well over a year.  Between 2022 and 2023, this Court and the assigned Magistrate Judge issued five separate discovery orders (ECF Nos. 355, 391, 410, 468, 470) in response to the parties' collective three

---

[1] For ease and consistency, all record citations refer to the ECF pagination.  Citations to exhibits refer to those filed at ECF No. 482 unless otherwise indicated.

United States District Court
Northern District of California

1    motions for discovery (ECF Nos. 336-2, 426-3, 438-3), one set of objections to a Magistrate Judge

2    order (ECF No. 356), and two motions for clarification (ECF Nos. 392-2, 469).  At the end of it

3    all, the government was ordered to produce at least 700 more pages worth of discovery than it

4    initially did.  *See* Exs. 2–27.

5        The produced documents revealed three main categories of information that may have been

6    favorable to Chang's defense but had not been disclosed earlier:

7        **First** is the agent misconduct that prompted the Ninth Circuit to remand Chang's case.

8    When Matulich was on foreign detail between July and August 2018, he paid for sex from a

9    foreign national.  Ex. 1C at 28–29, 35.  In violation of FBI policies, Matulich did not timely report

10   this incident upon his return to the United States.  *Id.* at 35–39, 139–40.

11       The documents produced in discovery show that the FBI began to suspect Matulich had

12   concealed information about his foreign detail several months later, on February 27, 2019.  On

13   that day, Matulich took a polygraph regarding his foreign detail that resulted in a finding of

14   "Deception Indicated."  *Id.* at 66.  Half a year passed before the FBI followed up with a second

15   polygraph on September 12, 2019.  When Matulich took that second polygraph, the results again

16   indicated deception.  This time, the polygraph examiner informed Matulich about the result,

17   prompting Matulich to admit that he had paid for sex while on foreign detail and that he had failed

18   to report the matter as required.  *Id.* at 59–62.  From there, it purportedly took another ten months

19   for the FBI to inform the U.S. Attorney's Office about its investigation of Matulich's misconduct.

20   Ex. 1B at 14.  And it was not until seven months after that, on February 9, 2021, that the FBI

21   supposedly disclosed to the U.S. Attorney's Office exactly what Matulich had done.  *Id.*  Finally,

22   one month later on March 22, 2021, the government disclosed this information to Chang.  *Id.* at 2–

23   3.  Eventually, the FBI suspended Matulich, and he decided to resign from the FBI.  Ex. 1C at

24   143–44, 149–50.

25       **Second** is a series of emails between prosecutors in the U.S. Attorney's Office dating back

26   to June 2019.  These emails reveal that, in the months leading up to Chang's trial, prosecutors

27   expressed grave concerns about Matulich's behavior and character in the context of Chang's case.

28   Ex. 3.  Prosecutors explained that "Matulich had not been completely forthright and transparent in

United States District Court
Northern District of California

1    his discussions with [them] regarding certain material facts involved in the Cheng [sic] fraud

2    investigation." *Id.* at 4.  This was more than a gut feeling—prosecutors noted that they had

3    particularized concerns about Matulich's honesty with respect to "three case-specific topics" in the

4    Chang investigation.  *Id.*  And they reported that Matulich had refused to answer questions posed

5    by the prosecutors assigned to Chang's case.  *Id.*  More broadly, prosecutors across the entire San

6    Jose office "express[ed] doubt about whether they [could] have complete confidence in the quality

7    and professionalism" of Matulich's investigatory work, and they questioned whether Matulich

8    could be a reliable part of their trial teams.  *Id.*

9        **Third** is an anonymous complaint, postmarked December 2019, that accused Matulich of a

10   "lack of candor" and "questionable ethics."  Ex. 4.  Eight months after receiving the complaint, the

11   FBI concluded that it did not warrant further investigation.  Ex. 5.  But the government did not

12   disclose any of this information to Chang until compelled to do so in post-trial discovery.

13                                    *        *        *

14       Based on the government's failure to earlier disclose these three categories of evidence,

15   Chang now moves for dismissal of his indictment with prejudice, new trial, or other sanctions.  In

16   his motion, Chang invokes the Court's authority under *Brady v. Maryland*, 373 U.S. 83 (1963), as

17   well as the Court's supervisory authority.[2]  Mot., ECF No. 483.[3]

18   **II.    LEGAL STANDARDS**

19       **A.    *Brady* Violation**

20       Under *Brady*, prosecutors have a constitutional obligation to turn over favorable evidence

21   to criminal defendants.  That is to say, "the suppression by the prosecution of evidence favorable

22   to an accused . . . violates due process where the evidence is material either to guilt or to

23

24   _____

     [2] Although Chang refers to Federal Rule of Criminal Procedure 33, he does not invoke Rule 33 as
25   an independent source of authority through which he seeks relief.

26   [3] Chang originally filed his motion for new trial at ECF No. 388 to comply with the deadline set
     by Rule 33.  At that time, Chang still had discovery requests outstanding.  Once discovery was
27   complete, Chang filed a supplemental memorandum at ECF No. 483.  Because this supplemental
     memorandum covers the same ground as the original motion (in addition to new ground from
28   newly received discovery), for convenience, the Court cites to this supplemental memorandum
     throughout the order rather than to the original motion.

United States District Court
Northern District of California

1  punishment." *Brady*, 373 U.S. at 87.

2      The contours of this obligation are broad.  Prosecutors must disclose both exculpatory and

3  impeaching evidence.  *United States v. Bagley*, 473 U.S. 667, 676 (1985) (citing *Giglio v. United*

4  *States*, 405 U.S. 150, 154 (1972)).  This duty to disclose exists "irrespective of the good faith or

5  bad faith of the prosecution." *Brady*, 373 U.S. at 87.  And the evidence that must be disclosed is

6  not limited to what prosecutors personally know.  "[T]he individual prosecutor has a duty to learn

7  of any favorable evidence known to the others acting on the government's behalf in this case."

8  *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437

9  (1995)).  Knowledge "held by members of the prosecution team," including "anything in the

10  possession, custody or control of any federal agency participating in the same investigation of the

11  defendant," is imputed to prosecutors.  *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 844

12  (9th Cir. 2024) (quoting *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989)).

13      That said, not every violation of a prosecutor's disclosure obligation is a constitutional

14  violation.  This is because *Brady* is grounded in due process, and due process is not concerned

15  with "punishment . . . for misdeeds of a prosecutor." *Brady*, 373 U.S. at 87.  Rather, its focus is

16  on the "avoidance of an unfair trial to the accused," *id.*, and with "ensur[ing] that a miscarriage of

17  justice does not occur." *Bagley*, 473 U.S. at 675.  Put differently, what matters for *Brady* is the

18  ultimate fairness of trial.  Even though prosecutors have a "broad duty of disclosure," "not every

19  violation of that duty necessarily establishes that the outcome [of a case] was unjust." *Strickler*,

20  527 U.S. at 281.  As such, only nondisclosure of material evidence—meaning evidence important

21  enough that its nondisclosure creates a "reasonable probability" of "undermin[ing] confidence in

22  the outcome of the trial"—is a constitutional violation.  *United States v. Kohring*, 637 F.3d 895,

23  902 (9th Cir. 2011) (quoting *Kyles*, 514 U.S. at 434).

24      In short, there are three elements to a *Brady* claim: "(1) the evidence at issue must be

25  favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that

26  evidence must have been suppressed by the State, either willfully or inadvertently; and (3)

27  prejudice must have ensued," meaning that the suppressed evidence must have been material. *Id.*

28  at 901 (citation omitted); *see also Silva v. Brown*, 416 F.3d 980, 985 (9th Cir. 2005) (explaining

1  that prejudice is equivalent to materiality in the *Brady* context).  A criminal defendant must prove

2  all three elements to establish a due process violation under *Brady*.

3  **B.    Supervisory Authority**

4  Apart from *Brady*, the Court may also invoke its supervisory authority (also referred to as

5  supervisory power) to address Chang's claim of government misconduct.  A court may sanction

6  the government under its supervisory authority after (1) determining that there was government

7  misconduct; (2) considering the government's culpability and prejudice to the defendant; and (3)

8  balancing the interests involved.

9  **1.    Government Misconduct**

10  Supervisory authority is a tool for "implement[ing] a remedy for the violation of a

11  recognized statutory or constitutional right."  *United States v. Chapman*, 524 F.3d 1073, 1085 (9th

12  Cir. 2008) (citation omitted); *see also United States v. Hasting*, 461 U.S. 499, 505 (1983)

13  (similar).  As such, government misconduct that violates established rights is necessary to trigger

14  the exercise of supervisory authority.  *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir.

15  2020); *United States v. Ross*, 372 F.3d 1097, 1109 (9th Cir. 2004).  Where *Brady* is at issue, like

16  here, the relevant misconduct triggering the Court's authority is the suppression of favorable

17  evidence (the first two elements of a *Brady* claim).  *See Bundy*, 968 F.3d at 1031.

18  **2.    Culpability and Prejudice**

19  Next, courts must consider two intertwined issues: the government's culpability and

20  prejudice to the defendant.  The government's level of culpability affects the severity of the

21  appropriate sanction.  In turn, the severity of the sanction being considered affects the showing of

22  prejudice needed.

23  The culpability inquiry distinguishes *Brady* from supervisory authority.  When assessing a

24  *Brady* claim, courts assign no significance to the magnitude of prosecutors' misdeeds.  Once a

25  court finds that favorable evidence was suppressed, all that matters is whether such suppression

26  affected the fairness of trial; the court does not consider prosecutors' bad faith, recklessness,

27  negligence, or any other intentions.  *Brady*, 373 U.S. at 87.  A simple mistake is treated no

28  differently than a concerted conspiracy to suppress exculpatory evidence.  By contrast, courts

exercise their supervisory authority for the express purpose of deterring government misconduct. *Hasting*, 461 U.S. at 505; *see also Bundy*, 968 F.3d at 1030; *Chapman*, 524 F.3d at 1085; *United States v. Woodley*, 9 F.3d 774, 777 (9th Cir. 1993). To achieve deterrence, any sanction should be proportional to culpability. *Cf. BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568, 575 (1996) (in the civil context, punitive damages are meant to deter misconduct and should be proportional to the "enormity of [the defendant's] offense" to do so) (citation omitted).

Prejudice counterbalances culpability against society's "interest in the prompt administration of justice and the interests of the victims." *Hasting*, 461 U.S. at 509. While it is important for courts to discipline prosecutors for their misconduct, courts must also be mindful that disturbing a guilty verdict has the potential to disrupt meritorious prosecutions and deny closure or restitution to victims. Given these competing interests, courts do not invoke their supervisory powers to vacate a guilty verdict unless the defendant has suffered some prejudice. *See United States v. Tucker*, 8 F.3d 673, 674–75 (9th Cir. 1993) (collecting cases "emphasiz[ing] the importance of prejudice as a trigger to the exercise of supervisory power"); *see also Bundy*, 968 F.3d at 1031; *Woodley*, 9 F.3d at 777. Otherwise, they could do damage to societal and victim interests by delaying a "conviction [that] would have been obtained notwithstanding the [government's] error." *Hasting*, 461 U.S. 506.

Dismissing an indictment with prejudice is the harshest sanction that a court can levy against the government because it ends the prosecution altogether, even if the prosecution has great merit. Such dismissals therefore require high levels of culpability. A defendant must show that the government's misbehavior is "flagrant" before she can seek dismissal with prejudice. *Bundy*, 968 F.3d at 1031 (quoting *United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993)). Mere accident, negligence, or even gross negligence is not enough. *Chapman*, 524 F.3d at 1085. However, bad intent is not necessary. To secure a dismissal with prejudice, it is enough for the defendant to show that the government acted with "reckless disregard for [its] constitutional obligations." *Id.* at 1085–86.

Dismissal also requires a relatively high prejudice showing. The defendant must show that she suffered "substantial prejudice." *Bundy*, 968 F.3d at 1031; *United States v. Jacobs*, 855 F.2d

United States District Court
Northern District of California

1    652, 655 (9th Cir. 1988).  In other words, she must show the government's misconduct "had at

2    least some impact on the verdict and thus redounded to the defendant's prejudice." *Ross*, 372 F.3d

3    at 1110 (quoting *United States v. Lopez*, 4 F.3d 1455, 1464 (9th Cir. 1993)) (brackets omitted).

4    This is akin to, but "less stringent" than, *Brady*'s prejudice standard.  *Id.*

5        At the other end of the spectrum of sanctions are those that would not disturb a guilty

6    verdict.  These pose much less risk of disrupting the efficient provision of justice, so there is no

7    need for the defendant to show prejudice at all before seeking such remedies.  *Jacobs*, 855 F.2d at

8    655 (citing *United States v. Cadet*, 727 F.2d 1453, 1470 (9th Cir. 1984)).  The appropriateness of

9    these remedies turns solely on the government's culpability, meaning "the sanction chosen must

10   be proportionate to the misconduct."  *Id.*

11       Granting a new trial sits somewhere in the middle of the spectrum of sanctions because it

12   results in the vacating of a guilty verdict but leaves open the possibility of re-conviction.  There is

13   no precedent identifying the minimum level of culpability necessary to justify a new trial.

14   Whatever the minimum bar though, flagrant government misconduct is sufficient to support a new

15   trial because it is sufficient to support the harsher sanction of dismissal.

16       As for prejudice, the Supreme Court has held that prejudice is effectively presumed when

17   courts invoke their supervisory power to grant a new trial because it is the government's burden to

18   demonstrate that any misconduct was *not* prejudicial.  To satisfy this burden and avoid a new trial,

19   the government must prove that its misconduct was harmless beyond a reasonable doubt.  *Hasting*,

20   461 U.S. at 507–10.  This approach reasonably places the burden on the government to excuse its

21   flagrant misbehavior rather than require Chang to demonstrate that such flagrant actions

22   prejudiced his trial.  And since the sanction of granting a new trial is less harsh than dismissal,

23   there is less need for strict guardrails.

24       To summarize, the culpability and prejudice analysis leads to three scenarios.  First,

25   flagrant misconduct coupled with substantial prejudice warrants dismissal.  Second, flagrant

26   misconduct coupled with the government's failure to prove harmlessness beyond a reasonable

27   doubt warrants a new trial.  And third, absent prejudice, any sanction short of dismissal and new

28   trial is warranted so long as it is proportional to the government's misconduct.

Case No.: 5:16-cr-00047-EJD-1

ORDER GRANTING NEW TRIAL             8

United States District Court
Northern District of California

### 3.    Balance of Interests

Finally, the court must "balanc[e] the interests involved."  *Hasting*, 461 U.S. at 507; *see also Bundy*, 968 F.3d at 1031.  This includes considering the "societal costs" of vacating a verdict that may well be correct, *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255–56 (1988), and whether "lesser remedial action" would sufficiently address the government's misconduct, *Bundy*, 968 F.3d at 1031, 1043 (quoting *Chapman*, 524 F.3d at 1087).  Ultimately, this balancing is an equitable inquiry, and courts may consider any equities involved, such as the effect that a retrial may have on victims or the fading of witnesses' memories.  *Hasting*, 461 U.S. at 507.

*        *        *

Before moving forward with applying these legal tests, it bears taking a step back to consider how this all fits together.  Undoubtedly, there are large overlaps between the *Brady* analysis and supervisory authority analysis.  But the two doctrines are distinct and serve complementary roles.  *Brady* guards against unfairness in trials while supervisory authority guards against culpable government misconduct.  There are situations where one authorizes a court to grant relief while the other does not.  For example, if an innocent mistake leads the government to withhold highly exculpatory evidence, *Brady* would require a new trial even though the government's lack of culpability prevents courts from issuing such relief under their supervisory authority.  On the other hand, if the government purposefully suppresses evidence that is less material, due to differing prejudice standards, a new trial might be appropriate under a court's supervisory authority but not under *Brady*.  Therefore, the Court must carefully examine the circumstances of this case under both authorities.

## III.    DISCUSSION

Since there is so much overlap between the tests for *Brady* and supervisory authority, the Court analyzes both simultaneously.  The Court starts by addressing whether favorable evidence was suppressed, an issue relevant to both tests.  The Court then turns to the question of culpability.  Next, the Court discusses prejudice, analyzing each of the possible prejudice standards for both *Brady* and supervisory authority.  Finally, the Court considers equitable factors for purposes of supervisory authority.

United States District Court
Northern District of California

1    In performing this analysis, the Court concludes that the government suppressed favorable

2    evidence and that its suppression was flagrant.  Because Chang is unable to make an affirmative

3    case of prejudice, he fails on his *Brady* claim and his bid to dismiss the indictment with prejudice.

4    However, when the burden shifts to the government to prove harmlessness, the government fails

5    to meet that burden, permitting the Court to grant a new trial under its supervisory authority.  As

6    equitable considerations do not mitigate the government's misconduct, the Court invokes that

7    authority to grant a new trial.

8        **A.        Favorable Evidence**

9        Evidence is favorable if it is either exculpatory or impeaching.  *Bagley*, 473 U.S. at 676.

10   The evidence at issue here pertains to Matulich's dishonesty rather than to the charged conduct for

11   which Chang was convicted, so it is plainly not exculpatory.  *United States v. Kramer*, No. 5:16-

12   cr-00322, 2023 WL 4295842, at *2 (N.D. Cal. June 22, 2023).  Favorability thus turns on whether

13   the evidence is impeaching.  If it can be used to "attack . . . the thoroughness and even the good

14   faith of the investigation," or could otherwise "throw the reliability of the investigation into

15   doubt," then it is impeaching and favorable to the defense.  *Kyles*, 514 U.S. at 445, 447.  Applying

16   this standard, the Court concludes that evidence showing prosecutors' doubts about Matulich's

17   truthfulness and Matulich's foreign misconduct are favorable, but that the anonymous complaint

18   received by the FBI is not.

19       **1.        Prosecutors' Doubts**

20       Favorability is the easiest to see when it comes to prosecutors' "case-related concerns"

21   about Matulich.  Ex. 3 at 4.  Recall that prosecutors were worried "Matulich had not been

22   completely forthright and transparent" when discussing the Chang investigation with them.  *Id.*

23   As a result, prosecutors reported that "[a] challenging, if not toxic, atmosphere appears to be

24   developing between the trial team and Matulich—one of distrust."  *Id.* at 2.  In fact, prosecutors

25   "[felt] strongly" enough about their concerns that they believed it was necessary "to discuss this

26   matter with Matulich, and presumably his supervisor, sooner rather than later."  *Id.*  Making

27   matters worse, the concerns were not limited to Chang's case.  Officewide, prosecutors

28   "express[ed] doubt about . . . the quality and professionalism" of Matulich's work.  *Id.* at 4.

United States District Court
Northern District of California

1    Taken together, prosecutors' concerns create reasonable misgivings about the Chang

2    investigation's thoroughness, good faith, and reliability.  Since Matulich was the lead investigator

3    in Chang's case, evidence showing problems with the quality of Matulich's work and with his

4    professionalism would allow Chang to attack the reliability and thoroughness of the investigation

5    as a whole.  For example, Chang could question whether Matulich missed important details or

6    failed to pursue leads pointing away from Chang.  *See Kyles*, 514 U.S. at 445; *see also id.* at 446

7    (defendant could have "attacked the reliability of the investigation in failing even to consider

8    [another's] possible guilt").  Stronger still, Chang could have argued that Matulich's apparent lack

9    of candor with prosecutors suggested a lack of good faith throughout the entire investigation.

10    The government counters that prosecutors' concerns are not favorable evidence because

11    Matulich did not testify at Chang's trial.  The fact that Matulich did not testify is a valid

12    consideration, but there is no rule saying that evidence about non-testifying witnesses is never

13    favorable for *Brady* purposes.  The Supreme Court's decision in *Kyles* illustrates this point.

14    There, the Supreme Court considered whether it violated *Brady* to withhold evidence impeaching

15    the credibility of an informant called "Beanie."  *Id.* at 424–32.  Even though Beanie did not testify,

16    *id.*, the Supreme Court held that the impeaching evidence was favorable because it "could have

17    laid the foundation for a vigorous argument that the police had been guilty of negligence" and

18    could have been used to "sully the credibility" of testifying law enforcement officers.  *Id.* at 447.

19    Here too, evidence about Matulich's lack of professionalism and potential lack of good faith could

20    be used to support Chang's argument that Matulich, whether purposefully or negligently, failed to

21    investigate leads that may have been favorable to Chang.

22    To be sure, the evidence about Beanie in *Kyles* was much more important to that case than

23    the evidence about Matulich's credibility is to this case.  "Beanie was essential" to the

24    investigation in *Kyles*, and he "made the case" against the defendant there.  *Kyles*, 514 U.S. at 445.

25    However, the strength of the evidence goes to materiality and prejudice under *Brady*.  The

26    question of favorability is a separate element distinct from materiality.  *Kohring*, 637 F.3d at 901.

27    Even if the evidence against Matulich is weak or unimportant, it is still favorable if it could be

28    used to impeach the investigation into Chang.

United States District Court
Northern District of California

1    The government's final counterargument on this point is that the emails memorializing

2    prosecutors' concerns are "opinions and mental impressions of the case" that cannot constitute

3    *Brady* material.  *Id.* at 907 (quoting *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006)).  This

4    argument relies on precedent holding that *Brady* does not require the disclosure of "opinion work

5    product," defined as a prosecutor's "strategies, legal theories, or impressions of the evidence."

6    *Morris*, 447 F.3d at 742.  But doubts about an investigator's honesty are neither strategies nor

7    legal theories.  Nor is it immediately obvious whether this type of doubt about an investigator's

8    actions qualifies as an "impression of the evidence," which the Court understands to refer to

9    prosecutors' thoughts on the merits of their case.

10    Regardless, the Court need not decide if prosecutors' emails fall within the scope of

11    opinion work product.  Even if those emails were opinion work product, the government still had

12    an obligation to disclose the "underlying exculpatory [or impeaching] facts" that informed

13    prosecutors' concerns.  *Kohring*, 637 F.3d at 907–08 (quoting *Morris*, 447 F.3d at 742).  The

14    prosecutors on Chang's case felt "strongly" enough about Matulich to escalate the issue to both

15    Matulich's supervisor at the FBI as well their own supervisors.  Ex. 3 at 2.  This indicates that

16    their concerns were based on more than idle speculation or personality conflicts; there were almost

17    certainly specific events and interactions that led prosecutors to develop their concerns about

18    Matulich.  Under *Brady*, those underlying events are favorable evidence that should have been

19    disclosed.

20    Accordingly, the Court concludes that prosecutors' doubts constitute favorable evidence.

21        **2.    Misconduct on Foreign Detail**

22    Much of the analysis on prosecutors' doubts applies equally to evidence of Matulich's

23    misconduct while on foreign detail.  The evidence showed that Matulich paid for sex from a

24    foreign national and then failed to disclose it to the FBI until caught by a polygraph examination.

25    Ex. 1B at 2–3.  Just like the evidence related to prosecutors' doubts, the evidence of Matulich's

26    dishonesty in connection with his foreign detail can be used to impeach the Chang investigation.

27    And this time, there is no concern that the evidence implicates opinion work product.  The

28    government does still argue that this evidence is weak.  But as the Court just explained, the

1  strength of the evidence is relevant to materiality under *Brady*. Favorability is a separate element.

2  This evidence is favorable.

3  ### 3.    Anonymous Complaint

4  The anonymous complaint is a different matter. *Brady* imposes broad obligations on the

5  government, but those obligations are not boundless. Namely, "*Brady* does not require a

6  prosecutor to turn over files reflecting leads and ongoing investigations where no exonerating or

7  impeaching evidence has turned up." *Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000); *see*

8  *also Gumm v. Mitchell*, 775 F.3d 345, 364 (6th Cir. 2014) ("Prosecutors are not necessarily

9  required to disclose every stray lead and anonymous tip . . . ."); *United States v. Souffront*, 338

10  F.3d 809, 823 (7th Cir. 2003) ("The failure to disclose untrustworthy and unsubstantiated

11  allegations against a government witness is not a *Brady* violation."); *United States v. Ray*, 61

12  F. App'x 37, 54 (4th Cir. 2003) (*Brady* does not require the disclosure of "sheer speculation").

13  That is to say, the government has no "obligation to communicate preliminary, challenged, or

14  speculative information." *United States v. Agurs*, 427 U.S. 97, 109 n.16 (1976) (quoting *Giles v.*

15  *Maryland*, 386 U.S. 66, 98 (1967) (Fortas, J., concurring)).

16  Although the substance of the anonymous complaint is similar to that of the evidence

17  found favorable above, the complaint is precisely the type of speculative, unsubstantiated

18  document that falls within this exception to *Brady*. The complaint vaguely alleges that Matulich

19  was "openly dismissive of FBI policies and procedures," and that a "large volume" of unnamed

20  FBI and Department of Justice employees made unidentified "complaints of misconduct" against

21  Matulich. Ex. 4. More specifically (though not by much), the complaint reports that prosecutors

22  expressed "an unwillingness to work with [Special Agent] Matulich again because of his lack of

23  candor," and that "Matulich's account of investigative activity changed over time and depending

24  on which [prosecutor] he spoke to." *Id.* But the complaint does not name those prosecutors, nor

25  does it offer concrete examples. Likewise, the complaint asserts that Matulich "made other agents

26  uncomfortable when documenting witness interviews and source reporting by exaggerating or

27  misstating information provided," all without providing specificity. *Id.*

28

United States District Court
Northern District of California

1    In addition to this lack of detail, the government points out the FBI ultimately concluded

2  that, "[a]fter a thorough review, . . . this [complaint] does not warrant the opening of an

3  administrative inquiry." Ex. 5.  Of course, the FBI's conclusion is not dispositive of the issue.

4  The government cannot "sidestep its *Brady* obligations simply by conducting its own investigation

5  and determining that potentially discoverable allegations are unsubstantiated." *United States v.*

6  *Bulger*, 816 F.3d 137, 155 (1st Cir. 2016).  Deferring to the FBI's conclusions in such situations,

7  without independent judicial scrutiny, would invite less-than-thorough (or even biased)

8  investigations that aim to avoid discovering potential *Brady* material.  This case illustrates why

9  these concerns are not merely hypothetical.  While the FBI concluded that the anonymous

10  complaint was insubstantial, there are apparently no records of any investigation that the FBI

11  undertook.  Ex. 12.  It is unclear exactly how "thorough" the FBI's review was, or if the FBI

12  conducted a meaningful review at all.  Without supporting documentation, the FBI's conclusion is

13  entitled to little weight.

14    Still, in these circumstances, the Court finds that no investigation was necessary.  The

15  anonymous complaint is simply too speculative to constitute favorable *Brady* evidence or to

16  warrant the allocation of resources for further investigation.  As discussed above, the complaint's

17  allegations are generic and contain no reference to specific events which one could use to confirm

18  the complaint's validity.  While generality may not be fatal if the allegations come from a known,

19  trustworthy source—as in the case of the concerns discussed in prosecutors' emails—the

20  complaint here is anonymous.  *Brady* does not require law enforcement to investigate every stray

21  anonymous tip no matter how unreliable that tip might appear on its face.

22    For this reason, the Court concludes that the anonymous complaint is not favorable

23  evidence that the government needed to disclose under *Brady*.

24    **B.    Suppression**

25    With the favorable evidence identified, the suppression analysis becomes straightforward.

26  Evidence within either a prosecutor's or an investigating federal agency's knowledge or

27  possession is imputed to the government for *Brady* purposes.  *Alahmedalabdaloklah*, 94 F.4th at

28  844.  Therefore, determining whether favorable evidence was suppressed is simply a matter of

1    identifying when evidence came into a prosecutor's or agency's knowledge or possession and then

2    considering when, if at all, the government disclosed that evidence to the defense.

3        Starting with prosecutors' doubts, the Court observes that evidence underlying those

4    doubts came to prosecutors' attention at least by June 5, 2019, when the first of the emails

5    documenting those doubts was sent. Ex. 3 at 2. That was two months before trial, which began on

6    August 13, 2019 (ECF No. 170), and several years before the government eventually produced the

7    emails in post-judgment discovery. That years-long delay constitutes suppression.

8        The Court reaches the same conclusion with respect to evidence about Matulich's

9    misconduct while on foreign detail. On September 12, 2019,[4] following a second failed

10    polygraph, Matulich admitted to the FBI that he had solicited sex while on foreign detail and then

11    failed to disclose it. Ex. 1C at 59–62. Yet, the government did not disclose anything related to

12    that admission until March 22, 2021, a year and a half later. Ex. 1B at 2–3. This delay also

13    constitutes suppression.

14        **C.    Culpability**

15        When the government acts in "reckless disregard" of its constitutional obligations, it

16    behaves flagrantly. *Chapman*, 524 F.3d at 1085. That is exactly what happened here when the

17    government failed to timely disclose evidence of Matulich's dishonesty.

18        Unlike almost any other litigant, the government does not only seek to win its case when it

19    brings criminal charges. As a long line of decisions from the Supreme Court on down have

20    recognized, the government's "duty is not to convict but to see that justice is done." *Holland v.*

21    *United States*, 348 U.S. 121, 136 (1954); *see also, e.g.*, *Berger v. United States*, 295 U.S. 78, 88

22    (1935); *United States v. Mazzarella*, 784 F.3d 532, 542 (9th Cir. 2015). Seeing as *Brady* itself

23    assumes "that the government's aim in a criminal trial is not victory but justice," this principle is

24    especially potent in the *Brady* context. *United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995).

25

26

27    [4] Arguably, the government was on notice of Matulich's dishonesty even earlier, when Matulich's February 2019 polygraph indicated deception. Ex. 1C at 66. The Court does not decide whether knowledge could have been attributed to the government then because it does not change the

28    Court's analysis.

United States District Court
Northern District of California

1  For that reason, courts have consistently warned the government to "err on the side of

2  transparency, resolving doubtful questions in favor of disclosure." *Cone v. Bell*, 556 U.S. 449,

3  470 n.15 (2009) (collecting Supreme Court cases); *see also Bundy*, 968 F.3d at 1041 ("[T]o the

4  extent that the prosecution doubted 'the usefulness of evidence,' the government 'should resolve

5  such doubts in favor of full disclosure.'") (citation omitted).  The government strayed far from this

6  standard of conduct.

7          Start with the evidence about Matulich's foreign misconduct.  On September 12, 2019,

8  Matulich confirmed he had failed to tell the FBI that he had paid for sex while abroad.  Ex. 1C at

9  59–62.  Despite having Matulich's personal admission in September 2019, the government did not

10  disclose this issue to Chang until March 22, 2021, a year and a half later.  Ex. 1B at 2–3.  The

11  Court understands that the government is a complex entity with many moving parts, and that it can

12  take time for information to travel from the FBI to the U.S. Attorney's Office.  But even allowing

13  for some delay, the fact that it took the government over a year to make its required disclosure

14  cannot be passed off as a simple mistake.

15          What makes this even worse is that prosecutors were on notice that Matulich had failed

16  polygraphs relating to his foreign detail by at least January 30, 2020, well before they disclosed

17  anything to Chang.  Ex. 8.  On that date, prosecutors received a letter from the Office of the

18  Inspector General expressly disclosing (a) that Matulich had twice failed polygraph exams and (b)

19  that Matulich disclosed to the FBI he had solicited sex while on official business.  *Id.*  Yet, nothing

20  in the record indicates prosecutors took any action in response to that letter.  Either they failed to

21  recognize the significance of the letter under *Brady*, they did recognize the significance but chose

22  to do nothing, or the letter got lost in the shuffle.  None of these scenarios reflect favorably on

23  prosecutors.  And that is not to mention the fact that prosecutors erroneously told Chang that they

24  had not learned about Matulich's misconduct until July 6, 2020.  Ex. 1B at 3.

25          Even taking at face value prosecutors' claims that they did not learn about Matulich's

26  issues until July 6, 2020, there was still an eight-month delay before they made any disclosures to

27  Chang.  Prosecutors cannot plausibly blame bureaucracy for this delay.  That is because the very

28  next day after receiving notice from the FBI, prosecutors recognized the information about

Case No.: 5:16-cr-00047-EJD-1
ORDER GRANTING NEW TRIAL          16

1    Matulich posed problems related to "any representations—or lack of disclosures—made between

2    the time of [Matulich's] incident and the time of his admission." Ex. 6 at 2. Eventually, they also

3    recognized that the problems were of a constitutional dimension. Ex. 9 at 3–4 (setting up meeting

4    between FBI agents and prosecutors for the purpose of discussing *Brady* issues related to

5    Matulich). Yet prosecutors did not "err on the side of transparency" as they were supposed to.

6    Instead, they sat on the information for months, even if in good faith, until they could no longer

7    deny the fact that they needed to disclose the information under *Brady*.

8         Compounding this already egregious behavior is prosecutors' even more egregious failure

9    to disclose anything about their own doubts regarding Matulich's trustworthiness. Prosecutors

10   *themselves* thought Matulich was untrustworthy to the point that they had reservations about

11   working with him on cases. Ex. 3 at 4. They *knew* that under *Brady*, they had the duty to disclose

12   information to Chang that would undermine Matulich's credibility. *Bagley*, 473 U.S. at 676.

13   They said nothing. That behavior goes far beyond recklessness.

14        Worst of all, across this entire series of events, prosecutors prioritized secrecy over

15   transparency. They sought to avoid "rais[ing] questions" and advised colleagues to pursue

16   inquiries into Matulich's behavior "discretely." Ex. 6 at 3. As one former prosecutor involved in

17   deliberations about Matulich recently wrote, when drafting emails about Matulich, he and his

18   colleagues had tried to be "careful enough with [their] written words" to avoid future scrutiny.

19   Post-Hr'g Ex. 1, ECF No. 522-1. And he expressed regret not about the late disclosures, but that

20   his prior emails might "make the [U.S. Attorney's] office look bad." *Id.* All this indicates that,

21   instead of fostering a culture of transparency, the U.S. Attorney's Office prioritized secrecy.

22        The government's actions in this matter were flagrant.

23   **D.    Prejudice**

24        Since the Court finds that the government's behavior was flagrant, the whole gamut of

25   sanctions up through dismissal with prejudice is available. There are three possible prejudice

26   standards for the Court to consider. First is materiality under *Brady*. Second is the substantial

27   prejudice standard that Chang must meet to secure dismissal under the Court's supervisory

28   authority. *Bundy*, 968 F.3d at 1031. Last is the harmless error standard that the government must

United States District Court
Northern District of California

1    meet to avoid a new trial under the Court's supervisory authority. *Hasting*, 461 U.S. at 510. The

2    Court addresses each in turn.

### 1.    *Brady* Materiality

4    When assessing materiality under *Brady*, courts begin by "evaluat[ing] . . . the undisclosed

5    evidence item by item." *Barker v. Fleming*, 423 F.3d 1085, 1094 (9th Cir. 2005) (quoting *Kyles*,

6    514 U.S. at 436 n.10). Specifically, courts evaluate the tendency of each individual piece of

7    undisclosed evidence to alter the result of trial. *See id.* After completing their item-wise analysis,

8    courts must then separately "evaluate [the] cumulative effect" of all the undisclosed evidence on

9    the result of trial. *Id.* (quoting *Kyles*, 514 U.S. at 436 n.10). At this step, courts ask whether

10   "there is a reasonable probability that," had all the undisclosed evidence been properly produced

11   to the defense, "the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

12   A reasonable probability exists whenever the "suppression of evidence 'undermines confidence in

13   the outcome of the trial.'" *Kohring*, 637 F.3d at 912 (quoting *Kyles*, 514 U.S. at 434). That is so

14   "even where the remaining evidence would have been sufficient to convict." *Jackson v. Brown*,

15   513 F.3d 1057, 1071 (9th Cir. 2008).

### a.    Item-by-Item Analysis

17   *Prosecutors' Doubts.* The evidence regarding prosecutors' doubts about Matulich's

18   honesty has only a weak tendency to call the result of trial into question. Remember that

19   prosecutors were concerned Matulich was not being "completely forthright and transparent" when

20   discussing Chang's case with them. Ex. 3 at 4. Those concerns could be used to impeach the

21   thoroughness and good faith of the investigation into Chang. *Kyles*, 514 U.S. at 445. However,

22   the fact that this evidence is impeaching only establishes that it is favorable, not that it is

23   necessarily material. *See United States v. Howell*, 231 F.3d 615, 625–27 (9th Cir. 2000) (holding

24   that evidence of investigatory errors was favorable but not material). As the government observes,

25   Matulich did not testify at trial, so the jury was never asked to consider Matulich's credibility. It

26   follows that "issues of [Matulich's] credibility had no bearing on" any matters that the jury

27   discussed during its deliberations. *Kramer*, 2023 WL 4295842, at *2.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    This chain of reasoning cuts against materiality, but it does not end the inquiry.  In a *Brady*

2    analysis, the import of previously undisclosed evidence is not limited to the strengthening of

3    existing arguments made at trial.  Had the government produced the evidence as required, the

4    defense may have taken a different approach to trial.  For example, the defense may have pursued

5    arguments or strategies that were not available without the government's *Brady* evidence.  Or the

6    defense could have chosen to pursue strategies that it initially thought were not worthwhile.

7    Courts can and must consider how the defense would have changed its approach to trial had the

8    government produced favorable evidence.  *See Kyles*, 514 U.S. at 445 (analyzing how the

9    opportunity to call a new witness might affect trial); *United States v. Aguilar*, 831 F. Supp. 2d

10   1180, 1204 (C.D. Cal. 2011) (finding a *Brady* violation where undisclosed evidence would have

11   allowed the defense to make an opening argument that was previously unavailable).  Indeed, that

12   is the very point of *Brady*—to safeguard criminal defendants' due process right to a "meaningful

13   opportunity to present a complete defense."  *California v. Trombetta*, 467 U.S. 479, 485 (1984).

14   Focusing only on the trial strategy that a defendant adopted with incomplete information undercuts

15   that right.

16   At trial, Chang did not raise any issues about Matulich's dishonesty because he was

17   unaware that such issues existed.  Had Chang been aware of those issues, he could have tried

18   cross-examining the government's witnesses about whether Matulich influenced their testimony.

19   Or, he could have tried calling Matulich as an adverse witness.[5]  *See Kyles*, 514 U.S. at 445.  That

20   way, Chang could have tried to impeach the investigation in his case by confronting Matulich with

21   evidence of dishonesty.

22   Ultimately though, Chang's inability to pursue either of those strategies does not

23   undermine confidence in the trial.  To begin, the record does not bear out Chang's suggestion that

24   Matulich influenced the government witnesses who testified at trial.  While Matulich may well

25   have been in frequent contact with the percipient fact witnesses at trial, Chang offers no

26

27   [5] Neither side addresses whether it would be proper as an evidentiary matter for Chang to call
     Matulich as a witness solely to attack his credibility.  For that reason, the Court expresses no
28   opinion on how it would rule should the government challenge Chang's ability to call Matulich.

1    evidentiary support showing that Matulich encouraged those witnesses to alter or distort their

2    testimony in any way.  In fact, Chang provides essentially no evidence showing what Matulich

3    said to those witnesses.

4        There is somewhat more documentation of Matulich's communications with the

5    government's forensic accountant and expert witness, Carlene Kikugawa.  None of those

6    documents show Matulich attempting to improperly influence Kikugawa into giving misleading or

7    slanted testimony.  Rather, the documents consist largely of benign messages about logistical

8    issues and summaries of financial or other factual information.  Exs. 13–14, 19 (communications);

9    Exs. 15–18, 20–21, 24 (summaries).  Some of the summaries may reflect Matulich's gloss on the

10   evidence, but Chang does not identify anything in the summaries that he believes to be wrong,

11   unfair, or otherwise inappropriate.  Nor does Chang identify any portions of Kikugawa's

12   testimony that he believes may have been improperly influenced by these messages and

13   summaries.

14       Even if Matulich had influenced Kikugawa in some way, that influence was harmless.

15   Kikugawa testified as an expert in forensic accounting.  In that role, she was asked to use her

16   specialized training in accounting to interpret various financial documents.  Kikugawa's testimony

17   therefore relied on three bases: the documents themselves, her training and experience, and her

18   application of specialized accounting principles.  Chang, however, had all the information he

19   needed to challenge Kikugawa on those three fronts.  Chang had access to the same documents

20   that Kikugawa did, and vigorously challenged Kikugawa's interpretations of those documents on

21   cross-examination.  Trial Tr. at 1199:9–1333:4, ECF No. 210.  Likewise, any influence that

22   Matulich might have had on Kikugawa's testimony would have had no bearing on Kikugawa's

23   objective qualifications.  As for Kikugawa's methodology, if Matulich had influenced her to

24   distort her methods at all, Chang could have attacked that point when he called his own forensic

25   accounting expert to dispute Kikugawa's opinions.  *Id.* at 1456:2–1567:2, ECF Nos. 211, 212.  So,

26   any evidence of Matulich influencing Kikugawa would contribute little to impeaching Kikugawa's

27   opinions.  *Cf. Heishman v. Ayers*, 621 F.3d 1030, 1035 (9th Cir. 2010) ("A witness may be so

28   thoroughly impeached that even evidence of perjury at trial is merely cumulative.") (cleaned up).

United States District Court
Northern District of California

1    That just leaves Chang's proposal to impeach the investigation as a whole, raising

2    generalized concerns about the investigation's quality by calling Matulich as an adverse witness.

3    This type of generalized concern has little tendency to undermine confidence in the trial.  Chang

4    cannot point to any specific investigatory missteps.  He cannot identify leads that should have

5    been followed up on but were not.  And he knows of no specific mistakes undercutting the

6    accuracy of the investigation's findings.  All that Chang can argue is that Matulich *might* have

7    distorted the investigation in some way because he is untrustworthy.  This is "mere speculation"

8    that cannot establish materiality.  *Barker*, 423 F.3d at 1099.

9    More broadly, evidence impeaching the reliability and good faith of an investigation is

10    unlikely to be material unless it is "tied to an investigatory method or choice made by officers

11    such that the unsoundness of those particular methods directly implicated the evidence presented

12    at trial."  *See Jennings v. Nash*, No. 6:18-cv-03261, 2020 WL 234678, at *17 (W.D. Mo. Jan. 15,

13    2020).  When courts have found such evidence to be material, there is usually a direct link

14    between an investigatory error and some evidence germane to guilt or innocence.  Most

15    commonly, this occurs when the government suppresses evidence showing that there were viable

16    leads pointing to alternative suspects which investigators failed to pursue.  *See, e.g.*, *Kyles*, 514

17    U.S. at 446; *Carriger v. Stewart*, 132 F.3d 463, 480–81 (9th Cir. 1997); *Fontenot v. Crow*, 4 F.4th

18    982, 1076 (10th Cir. 2021); *Juniper v. Zook*, 876 F.3d 551, 570–71 (4th Cir. 2017); *Bies v.

19    Sheldon*, 775 F.3d 386, 401 (6th Cir. 2014); *United States v. Bates*, 677 F. Supp. 3d 1200, 1216

20    (D. Nev. 2023).  The suppression of other investigatory missteps that compromise evidentiary

21    integrity have also led courts to find *Brady* violations.  *See, e.g.*, *Kyles*, 514 U.S. at 446

22    (potentially planted evidence); *Fontenot v. Allbaugh*, 402 F. Supp. 3d 1110, 1180 (E.D. Okla.

23    2019) (failure to secure crime scene); *Castellanos v. Kirkpatrick*, No. 10-cv-5075, 2017 WL

24    2817048, at *23–24 (E.D.N.Y. June 29, 2017) (failure to disclose that a detective had previously

25    been accused of coercing or falsifying confessions).

26    ///

27    ///

28    ///

United States District Court
Northern District of California

United States District Court
Northern District of California

Generic attacks on the entirety of an investigation are usually not sufficient, but that is all Chang offers here.[6]  Consequently, Chang's arguments do little to show that the evidence of prosecutors' doubts is material.

*Misconduct on Foreign Detail.*  The significance of the evidence showing Matulich's misconduct while abroad is the same as that of prosecutors' doubts—that Matulich is untrustworthy—so much of the same analysis of prosecutors' doubts applies here.  The evidence about foreign misconduct is weaker, though, because it is "collateral" to the issues in Chang's trial.  *Widmer v. Okereke*, No. 24-3054, 2025 WL 1432584, at *8 (6th Cir. May 19, 2025) (evidence showing an investigator lied about his background to gain employment and promotions in the police force was not material under *Brady*).  While prosecutors' doubts were directly tied to Matulich's actions in the investigation of Chang, Matulich's foreign misconduct was a personal issue that has no connection to the charged conduct in this case.

As the Court explained in a separate case where Matulich also served as the lead investigator, the fact that Matulich solicited sex from a prostitute while abroad is a personally embarrassing matter, "so he had a personal incentive to hide it from his coworkers and supervisors."  *Kramer*, 2023 WL 4295842, at *2.  "By contrast, information from the investigation of [Chang] does not implicate the same type of [personally sensitive] details of Matulich's own life that he would be embarrassed to disclose."  *Id.*  Accordingly, the evidence of Matulich's foreign misconduct has little tendency to call into question the investigation's reliability and thus has little tendency to undermine confidence in the outcome of trial.

### b.    Cumulative Analysis

Neither piece of *Brady* evidence is material alone, nor do they come much closer to meeting the materiality threshold when considered together.  The main effect of considering the two together is that they reinforce the concerns about Matulich's trustworthiness since both pieces of evidence call Matulich's honesty into question.  However, that does not change the fact that

---

[6] That is not to say generalized attacks on an investigation can never be material.  For that to happen, though, any doubts raised about the investigation's integrity would need to be much more severe than those here.

United States District Court
Northern District of California

1    Chang cannot point to the type of specific investigatory error typically needed for materiality.

2          Chang's primary response is that his case was so close that even the small advantage he

3    might derive from making a generalized attack on the investigation's credibility could have tipped

4    the scales in his favor.  In support, Chang points to the fact that the jury took approximately three

5    days to deliberate.  Minute Entries, ECF Nos. 195–97, 199.  From this, Chang infers that the case

6    must have been close.

7          It is true enough that "lengthy deliberations suggest a difficult case" and therefore weigh in

8    favor of finding that any errors by the government would have affected the outcome of trial.

9    *United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001) (en banc) (cleaned up).

10   Chang is also correct that three days can be long enough to invoke this inference.  *E.g.*, *id.* (four

11   days); *United States v. Obagi*, 965 F.3d 993, 998 (9th Cir. 2020) (three days resulting in a split

12   verdict); *United States v. Leal-Del Carmen*, 697 F.3d 964, 976 (9th Cir. 2012) (two days resulting

13   in a split verdict).  Deliberation length is just one factor in assessing prejudice, though, and it is

14   not dispositive.  *Johnson v. United States*, 139 F.4th 830, 842 (9th Cir. 2025); *see also Dugas v.*

15   *Coplan*, 428 F.3d 317, 335 (1st Cir. 2005) ("The length of jury deliberations can be one factor in

16   determining how close the jury viewed the case to be.").  "How the length of jury deliberations

17   affects the prejudice analysis depends on the precise circumstances."  *Dugas*, 428 F.3d at 335

18   n.28.  When a trial itself is longer or more complex, it is natural to expect jury deliberations to take

19   longer.  *See Carter v. Davis*, 946 F.3d 489, 512 (9th Cir. 2019).  So, while courts can often infer

20   prejudice from lengthy jury deliberations, the strength of that inference varies.

21         In these circumstances, the inference that Chang advances is lacking.  The jury's three days

22   of deliberation are proportionate to the complexity of trial.  The trial took ten days, involved two

23   defendants, and tasked the jury with delivering verdicts on nine charges for each defendant.  With

24   so much to consider, it is not surprising that the jury took three days to decide.  Moreover, there is

25   a clear pattern to the jury's verdict.  The jury found that the government had proven its case as to

26   all charges solely related to Chang but deadlocked on all charges involving his wife.  *See* Jury

27   Verdict.  This suggests an alternative, and perhaps more compelling, inference:  The jury found

28   the case against Chang to be easy, but the case against his wife to be hard.  Contrary to Chang's

1    preferred inference, this one weighs *against* materiality.

2        The significance of deliberation length in this case is inconclusive at best.  Therefore,

3    deliberation length does not alter the Court's conclusion that the *Brady* evidence is immaterial.

### 2. Substantial Prejudice

5        Substantial prejudice "is a less stringent standard than the *Brady* materiality standard

6    applied above."  *Ross*, 372 F.3d at 1110.  That said, the analysis of substantial prejudice is similar

7    enough to that of *Brady* materiality that the Court finds no substantial prejudice for the same

8    reasons given in the section above.  Chang simply has not identified any specific investigatory

9    misstep affecting meaningful issues in his case.  *See id.* (reaching the same conclusion on *Brady*

10   materiality and substantial prejudice).

### 3. Harmless Error

12       Unlike the analyses for *Brady* materiality and substantial prejudice, which place the burden

13   of proof on Chang, harmless error analysis places the burden of proof on the government.

14   *Hasting*, 461 U.S. at 510.  Harmless error is also subject to a much higher burden.  The

15   government must prove that, based upon "the trial record as a whole," its misconduct was

16   harmless beyond a reasonable doubt.  *Id.* at 509.  When "there is a reasonable possibility that the

17   [government's] error materially affected the verdict," the government has failed to meet its

18   burden.  *United States v. Valle-Valdez*, 554 F.2d 911, 915 (9th Cir. 1977); *see also United States v.*

19   *Rubio-Villareal*, 967 F.2d 294, 296 n.3 (9th Cir. 1992) (en banc).

20       Holding the government to its strict burden, the Court finds that the government's actions

21   were not harmless.  As discussed above, Matulich has a penchant for dishonesty.  *See* Ex. 1C at

22   59–62 (Matulich concealing his foreign misconduct from the FBI); Ex. 3 (prosecutors' doubts

23   about Matulich's honesty).  That dishonesty is tied directly to Chang's case.  *See* Ex. 3 at 4.  And

24   Matulich, as the lead investigator in Chang's case, frequently spoke with witnesses.  *See* Ex. 25.

25   From this, a reasonable juror could infer that Matulich used dishonest means to strengthen the

26   investigative case against Chang, including by influencing the witnesses he spoke with to slant

27   their testimony against Chang.  While this inference was not strong enough to carry Chang's

28   affirmative burden under the *Brady* and substantial prejudice standards, on harmless error review,

United States District Court
Northern District of California

1    the burden shifts to the government to dispel reasonable doubts.  *Hasting*, 461 U.S. at 510.  This

2    inference of witness influence may not be strong, but it is reasonable.

3         In a similar vein, Chang's argument about lengthy jury deliberations plays a bigger role in

4    the harmless error analysis than it did in the *Brady* and substantial prejudice analyses.  Although

5    the inference to be drawn from these deliberations—that long deliberations are a sign of a close

6    case—is weak under these circumstances, the inference is nonetheless reasonable.  *See Velarde-*

7    *Gomez*, 269 F.3d at 1036.  It would be inappropriate for the Court to completely disregard a

8    reasonable inference in Chang's favor when the government bears the burden to rebut reasonable

9    doubts.  And in a close case, courts err on the side of finding errors to not be harmless.  *Chun v.*

10   *Lopez*, 652 F. App'x 500, 501 (9th Cir. 2016) (quoting *Glasser v. United States*, 315 U.S. 60, 67

11   (1942), *recognized as superseded on other grounds by Bourjaily v. United States*, 483 U.S. 171,

12   181 (1987)).  Altogether, Matulich's dishonesty combined with the length of jury deliberations

13   creates reasonable doubt about whether the government's misconduct affected the outcome of

14   Chang's trial.

15        The government has managed to dispel those doubts to the extent that Chang suggests

16   Matulich influenced Kikugawa's testimony.  Since Kikugawa served as the government's expert,

17   Chang already had all the information he needed to thoroughly cross-examine her on the stand.

18   *Supra* Section III.D.1.a.  However, the same cannot be said for the percipient fact witnesses,

19   whom Chang could not have impeached on the basis of Matulich's potential influence before

20   Matulich's misconduct was revealed.

21        The government responds that there is no evidence in the record that Matulich *did*

22   influence witness testimony.  That is true.  And that one the reason Chang was unable to meet his

23   affirmative burden to show *Brady* materiality or substantial prejudice.  But as the Court has

24   emphasized repeatedly in its harmless error analysis, the burden is now on the government.  Chang

25   does not need to affirmatively prove that witnesses were influenced.  Instead, because it is

26   reasonable to infer that Matulich influenced fact witnesses based on his documented dishonesty,

27   the government must prove beyond a reasonable doubt that the witnesses were not influenced.

28   *Hasting*, 461 U.S. at 510.

United States District Court
Northern District of California

1      Nobody asked the witnesses at trial whether Matulich influenced them, so there is no direct

2   evidence rebutting the inference of witness influence.  The government's remaining circumstantial

3   evidence is insufficient to meet its high burden.  First, the government points to evidence showing

4   that Matulich did not interview any witnesses alone in the lead-up to trial.  Ex. A, ECF No. 489-2.

5   The government argues that this shows Matulich could not have had the opportunity to improperly

6   influence witnesses since others were present.  However, Matulich's contacts with witnesses were

7   not limited to these formal interviews.  Matulich frequently called witnesses in less formal

8   settings.  Ex. 25.  There is no record of what was discussed during those calls, so Matulich may

9   well have exerted influence on those witnesses then.

10      Next, the government argues that Chang received access to notes from the pre-indictment

11   interviews of certain witnesses, so any deviations in testimony due to Matulich's influence could

12   have been caught and impeached at trial.  In so arguing, the government overlooks its own

13   position that these pre-indictment notes "are not statements of the witnesses" and that "[t]here is

14   no indication that [the] notes are verbatim recitals of witnesses' oral statements or that a witness

15   adopted the notes as his or her own statements."  U.S. Resp. at 3, ECF No. 173.  As such, the

16   government conceded that the notes were not relevant to impeachment or even to refresh

17   witnesses' recollections.  *Id.* at 3–4.  In any case, concerns about Matulich's influence are not

18   limited to the inducement of lies.  Matulich may have directed witnesses to frame their testimony

19   in ways more favorable to the prosecution than they otherwise would have.  If a juror knew this,

20   that could undermine a witness's credibility even if Chang were unable to catch that witness in an

21   explicit lie.

22      To be clear, the Court is not drawing any conclusions about whether Matulich actually

23   influenced witnesses in this way.  It is only observing that it is possible to draw reasonable

24   inferences along those lines.  And it is only possible to draw such inferences because there are

25   gaps in the record.  Those gaps in the record, rather than any factual findings about what may or

26   may not have occurred, are the reason the government cannot meet its burden.  After all, it makes

27   little sense to say that the government can *prove* harmlessness by relying on a *lack* of evidence in

28   the record.  Just as Chang could not meet his burden to show prejudice because the record is silent

United States District Court
Northern District of California

1    as to any concrete way in which Matulich's misconduct harmed him, the government cannot meet

2    its burden to show harmlessness given the lack of evidence documenting Matulich's interactions

3    with witnesses.  Where there is so little evidence in the record, whichever party bears the burden

4    of proof is apt to fail.

5           The government has not established harmlessness beyond a reasonable doubt.

6           **E.      Equitable Balancing**

7           Finally, the Court turns to balancing.  In conducting its balancing analysis, the Court must

8    consider whether lesser sanctions would be sufficient.  *Bundy*, 968 F.3d at 1031, 1043.  The Court

9    must also consider the societal costs of vacating the verdict along with any other relevant equities.

10   *Bank of Nova Scotia*, 487 U.S. at 255; *Hasting*, 461 U.S. at 507.

11          Beginning with the question of lesser sanctions, the Court finds that granting a new trial

12   under its supervisory authority—the harshest sanction available based on the Court's culpability

13   and prejudice analyses—is appropriate.  Now that trial is over, the only lesser sanction available is

14   to award attorneys' fees to Chang.  But fees are grossly inadequate to deter future misconduct

15   given the seriousness of the government's failures in this case.  At most, awarding attorneys' fees

16   would send the message that prosecutors can play fast and loose with constitutional rules as long

17   as they do not cause too much damage and are willing to pay a penalty.  That is not the mindset

18   that prosecutors should have.  The Court, and our society, expects prosecutors to do their best to

19   scrupulously adhere to rules and constitutional norms.  Naturally, mistakes will happen, and the

20   law can excuse some mistakes if prosecutors have done their best.  But prosecutors' actions in this

21   case are far from their best.  It is disappointing and unacceptable for prosecutors to have fallen this

22   short of their constitutional obligations.  Only granting a new trial will be sufficient to deter future

23   misconduct of this nature.

24          As for the remaining equitable factors, the Court finds that those weigh in favor of granting

25   a new trial as well.  Certainly, there are societal costs that come with vacating Chang's conviction.

26   Prosecutors will have to expend further resources to retry Chang, resources that could have been

27   directed to other cases.  Chang's victims will also need to wait longer for any potential restitution.

28   And jurors will need to take time out of their busy lives to hear the case.  But at the same time, a

United States District Court
Northern District of California

retrial should be more efficient than Chang's original trial. Having gone through trial once already, both parties should have a keener sense of what evidence is most important. By focusing on that evidence, they can streamline trial. The parties also have transcripts from the first trial, which help guard against fading memories. Those transcripts can be used to refresh witnesses' recollections or even potentially as substitutes for witness testimony if a witness becomes unavailable for the second trial. Fed. R. Evid. 803(5) (recorded recollection), 804(b)(1) (former testimony); *United States v. Duenas*, 691 F.3d 1070, 1086 n.10 (9th Cir. 2012) ("Where the requirements of Rule 804(b)(1) are met, we generally conclude that the Confrontation Clause is not violated."). Chang's wife will also not be on trial, further removing a complicating factor.

In short, granting a new trial necessarily entails some costs. But in these circumstances, those costs are not as high as one might think, and the government can move quickly to retry Chang if it chooses. When weighed against the need to ensure that prosecutors operate at the highest ethical level, the costs of retrial are well worth it, and the equities weigh in favor of granting a new trial.

## IV.    CONCLUSION

The Court **GRANTS** Chang's motion for a new trial but **DENIES** his alternative requests for relief.[7] The Court therefore **VACATES** Chang's conviction and sentence.

**IT IS SO ORDERED.**

Dated: July 29, 2025

EDWARD J. DAVILA
United States District Judge

---

[7] The Court reaches a different result here than it did in *Kramer*, 2023 WL 4295842, a case that also involved Matulich. This is for two reasons. First, the record in this case contains more evidence than the record in *Kramer*. Second, Chang sought new trial under the Court's supervisory authority while Kramer did not.